Filed 3/11/15  P. v. Palomar CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>MARCOS PALOMAR,<br><br>    Defendant and Appellant. | F067273<br><br>(Super. Ct. No. MCR042891)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Madera County.  Ernest J. LiCalsi, Judge.

Richard A. Levy, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Jennevee H. de Guzman, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

**INTRODUCTION**

Following a jury trial, defendant Marcos Palomar was convicted of four sexual offenses involving his daughter. He was sentenced to a determinate term of 16 years and a consecutive, indeterminate term of 15 years to life.

Defendant alleges several errors on appeal: (1) the trial court erred in admitting defendant's two statements in violation of the *Miranda* (*Miranda v. Arizona* (1966) 384 U.S. 436) rule; (2) the trial court erred in failing to instruct sua sponte on unanimity as to the oral copulation alleged in count 1; (3) there was insufficient evidence of force regarding the forcible lewd conduct alleged in count 4; (4) when the trial court applied the amended sentencing triad to count 4 in the absence of a jury finding that the conduct occurred before the effective date of the amendment, it violated the ex post facto clause and defendant's rights to have a jury determine every fact required for imposition of a mandatory minimum; (5) the trial court erred in refusing to permit defense counsel to use a chart illustrating the concept of reasonable doubt during closing argument; (6) the trial court committed error by denying defendant's motion to quash the venire when an individual "gave a highly emotional and inflammatory account of her own family's victimization"; (7) these cumulative errors require reversal; and (8) the court's minutes and the abstract of judgment should be corrected to strike the presentence report fee because the court found defendant unable to pay the fee. We will strike the presentence report fee imposed at sentencing and affirm the judgment in all other respects.

**BRIEF FACTUAL AND PROCEDURAL SUMMARY**[1]

By a second amended information filed in January 2013, defendant was alleged to have committed (1) oral copulation upon a child 10 years of age or younger (Pen. Code, § 288.7, subd. (b); count 1); (2) lewd and lascivious acts upon a child 14 years of age or younger (§ 288, subd. (a); counts 2 & 3); and (3) a lewd and lascivious act upon a child

---

[1]A more detailed recitation of the facts is not required for resolution of the issues on appeal. Where necessary, the facts will be discussed in more detail.

14 years of age or younger by use of force, violence, duress, menace or threat of great bodily harm (§ 288, subd. (b)(1); count 4). Defendant pled not guilty to all counts and denied all allegations.

More specifically, during a period of about one year, defendant sexually abused his then nine- or ten-year-old daughter in their home. At trial, Jane Doe testified her father touched her breasts and vagina on more than one occasion. In a forensic interview conducted shortly after her allegations surfaced, Jane told the interviewer defendant had also pushed her head down and placed his penis in her mouth. The interview was played for the jury after Jane denied during her trial testimony that conduct had occurred.

Defendant testified as well. He claimed he touched his daughter's breasts only in response to her complaints of pain in that area. Further, he stated he touched her briefly on one occasion, over her clothing, to ensure she was wearing a sanitary napkin overnight because she was menstruating.

With specific regard to the admissions of sexual contact with his daughter made during an interview with Detective Mark Trukki several days after his arrest, defendant testified the only reason he admitted to placing his penis in his daughter's mouth was because Trukki told defendant before the recorded portion[2] of the interview began that only he (Trukki) could help get defendant out of jail, and such an admission was necessary for defendant to receive that help. Defendant further testified he "made up" the other admissions regarding sexual contact with his daughter as a way to further elicit

---

[2]Defendant testified he had a conversation with Detective Trukki before Trukki turned on the recording device. He says Trukki offered his assistance in exchange for defendant admitting he placed his penis in his daughter's mouth. That, defendant testified, is the reason he admitted to doing so. Nevertheless, when listening to the recording, one can plainly hear someone outside of the room saying "Hey, come in." A door opens and Detective Trukki asks the arriving individual whether he is "Marcos," and after receiving an affirmative reply, Trukki introduces himself and Detective Josh Chavez. Trukki then asks defendant to move in a little closer so they can "shut the door." Trukki thanks someone and the door can be heard closing. After review of this evidence, there is no reason to believe a conversation occurred between Trukki and defendant prior to the beginning of the audio recording.

Trukki's assistance. He testified he never placed his penis in his daughter's mouth nor did he ever touch her sexually as was alleged.

The jury convicted defendant of all counts. He was sentenced to a total determinate term of 16 years, as well as a consecutive indeterminate term of 15 years to life. This appeal followed.

## DISCUSSION

### I. *Miranda* Violations

Defendant alleges the trial court erred in admitting his two statements to law enforcement as a result of separate *Miranda* violations. More specifically, he contends Officer John Rosel's admonition was defective because it implied discretion regarding the appointment of counsel for those who are indigent. Further, he argues Detective Chavez's admonition was defective for it failed to advise defendant that an attorney could be appointed at no cost. Plaintiff contends defendant has forfeited his claim on appeal because he failed to make this specific objection below. Even assuming the claim has not been waived, the People assert the statements were properly admitted. We find the claim to be forfeited.

#### A. Forfeiture

We begin by determining whether defendant forfeited this claim by failing to properly object below.

"Evidence Code section 353, subdivision (a) allows a judgment to be reversed because of erroneous admission of evidence only if an objection to the evidence or a motion to strike it was 'timely made and so stated as to make clear the specific ground of the objection.'" (*People v. Demetrulias* (2006) 39 Cal.4th 1, 20; see *People v. Waidla* (2000) 22 Cal.4th 690, 717.) Courts have consistently held that a defendant's failure "'"'to make a timely and specific objection' on the ground asserted on appeal makes that ground not cognizable.'" [Citation.]" (*Demetrulias*, at p. 20; see *People v. Linton* (2013) 56 Cal.4th 1146, 1170 [failure to raise claim of invalidity of *Miranda* waiver forfeits

4.

claim on appeal]; *People v. Williams* (2010) 49 Cal.4th 405, 424-425 [same].) "To satisfy Evidence Code section 353, subdivision (a), the objection or motion to strike must be both timely *and* specific as to its ground. An objection to evidence must generally be preserved by specific objection at the time the evidence is introduced; the opponent cannot make a 'placeholder' objection stating general or incorrect grounds (e.g., 'relevance') and revise the objection later in a motion to strike stating specific or different grounds." (*People v. Demetrulias*, *supra*, at p. 22.)

> "'The appellate court's review of the trial court's admission of evidence is then limited to the stated ground for the objection. (Evid. Code, § 353.)' (*People v. Kennedy* (2005) 36 Cal.4th 595, 612.) 'What is important is that the objection fairly inform the trial court, as well as the party offering the evidence, of the specific reason or reasons the objecting party believes the evidence should be excluded, so the party offering the evidence can respond appropriately and the court can make a fully informed ruling. If the court overrules the objection, the objecting party may argue on appeal that the evidence should have been excluded for the reason asserted at trial, but it may not argue on appeal that the court should have excluded the evidence for a reason different from the one stated at trial. A party cannot argue the court erred in failing to conduct an analysis it was not asked to conduct.' (*People v. Partida* (2005) 37 Cal.4th 428, 435.)" (*People v. Abel* (2012) 53 Cal.4th 891, 924.)

Here, defendant's motion in limine sought to exclude his statements to law enforcement as follows:

> "13. Exclude all evidence of, and references to, any statements [defendant] is alleged to have made, or conduct a hearing pursuant to Evidence Code section 402. An accused who is in custody must be informed of the rights to remain silent and to an attorney, including an appointed attorney if the defendant is indigent. (*Miranda v. Arizona*[, *supra*,] 384 U.S. 436.) Statements obtained in violation of Miranda are inadmissible to establish guilt. (*People v. Boyer* (1989) 48 Cal.3d 247, 271.)"

Defendant's motion in limine does not amount to a specific objection that the admonitions recited by Rosel and Trukki were defective because the former improperly implied discretion and the latter failed to include the words "sin pagar" and employed the

verb "conseguir." In fact, it fails to explain in any way why the evidence should be excluded. It is nothing more than a placeholder.

At the separate hearing on the admissibility of defendant's statements, and following the testimony of Rosel, Trukki, and Chavez as well as that of defendant, argument was heard and the court ruled thereafter:

> "[DEFENSE COUNSEL]: Yes, Your Honor. Ask the Court to exclude his statements predicated upon I think the totality of the circumstances here. We have an individual that says he has been here 15 years but he is not versed in our system of jurisprudence, in our legal system. He—there's some question as to fully understanding everything but I don't necessarily think that's particularly significant at this point to the extent that I think he understood most of what was going on as his testimony reflects. However, we have an individual that's—that was taken in, left by himself as indicated he was, for want of a better term, isolated for a little over two days, and then was told, as he has testified here today, that without speaking to them about things that they already knew that had occurred and admitting these things to them, he would not be receiving any help. I think the actual statement was, 'I am the only one that can help you here.' I think under those circumstances that's enough to meet the threshold in conjunction with the other factors involved. I think there's a causal connection between this form of coercion and his statements slash admissions confessions. I don't think the voluntariness of this person's statement excluded only to the fact that he voluntarily—or without being forced physically to make the statement. I think it can be also inferred by the circumstances surrounding it. I think case law holds that. The *Vincent* [*sic: Benson*] case, 1990, 52 Cal. 3rd 754 is on—I think it deals with that issue. And I think there's—it talks about approximate causation between the statements and inferred or express guarantees. And I think that those factors are present here.

> "In looking at various factors courts have looked at over the years to indicate the legitimacy or coerciveness of a statement characteristic of the accused, that is not an objective test. It's personal and unique to the individual even though the totality of the circumstances boils down to objective test, the nature and characteristics of the individual, the accused, are to be taken for their own unique value.

> "THE COURT: Still an objective test.

> "[DEFENSE COUNSEL]: Sure. Limited education is one of the factors, emotional state whether the person is depressed or fatigue is another factor. The experience or lack of with the police and the criminal

6.

justice system is another. Culture differences, English language difficulties, improper translations which I don't necessarily think we are at issue here. And, of course, the citizenship of the person.

"Now I don't think there's any testimony here regarding any promises regarding citizenship but certainly we have testimony regarding other promises of assistance, other factors are the circumstances of the interrogation and the condition of the confinement. He has indicated that he was isolated.

"THE COURT: Doesn't *Colorado vs. Conley* have to say there has to be some law enforcement action?

"[DEFENSE COUNSEL]: In terms of—

"THE COURT: In terms of what caused the coercive nature?

"[DEFENSE COUNSEL]: Yes. I would agree with that, yes, absolutely. In this case it's the implied promises of assistance. Of course, again the custodial status and location of the interrogation are important, size of the room, whether it's locked. There's testimony that he was not sure if it's locked or not by Detective Trukki.

"THE COURT: According to your client it was open in the beginning.

"[DEFENSE COUNSEL]: In the beginning, correct, and subsequently was shut. As far as the isolation and detention, again another big factor. Now express or implied threats, I think *People v Flores* touches on that and threats express or implied of heavy punishment and/or promises or suggestions of leniency or other advantages is a confession. In [*sic*] a confession is given—a different confession is given, render a statement inadmissible *People vs Flores*, 1983, 144 Cal. App. 3rd, 459 and 471. And lastly, *People vs Esqueda*, 1993, 17 Cal. App. 4th, 1450 at 1485 and 86, it's about—and it's also referenced in *People v Jimenez* 1978, 21 Cal. 3rd, 595 at 613. And that case states, 'in any event even if we were to assume that no express promises to the defendant had, in fact, been made, our conclusion is that the defendant's first confession was involuntary, would remain unchanged because we believe that the confession was a result of an implied promises of leniency.'

"Lastly, *People v Johnson* 1969, 70 Cal. 2nd 469 at 478 indicates it is not a bare language but the nature of the benefit to be derived by a defendant if he speaks the truth that has been held to distinguish permissible and impermissible police conduct.

7.

"I would submit to the court that the totality of the circumstances in this case do indicate that this was because of those factors involuntary admission and/or statement and, therefore, should be excluded. And I would submit it.

"THE COURT: All right. Well, much of your argument is predicated on what the defendant's testimony stated. I find that the testimony—that the defendant has lied in almost every material fact as far as what happened and, therefore, I have no faith in anything that the defendant has said on the issue of voluntariness. I find that the interview conducted by Officer Rosel was knowing, intelligent, voluntary. He waived his Miranda Rights. There was no coercion whatsoever. And that he was properly advised. I will admit that two and a half days later or so when the defendant was advised of his rights again the issue is did he need to be advised of his rights? I am not certain but I find in combination of his previous rights that he was advised or he was advised properly in conjunction with these rights that were given when Detective Trukki advised him.

"I find that the defendant gave a knowing intelligent waiver on that. The defendant has been in this country for 15 years based on the totality of the circumstances. And my listening to the tape as well as the transcript, I find that the defendant understood everything that Detective Trukki was saying to him. For those reasons, both statements are admissible."

We find defendant's arguments below to be different from the arguments he now presents on appeal. A fair interpretation of defense counsel's argument reveals the following.

First, his argument clearly focuses on defendant's statement to Trukki, rather than to Rosel. Additionally, when examining Rosel, defense counsel did not inquire into the specific Spanish language used by Rosel. Rather, counsel followed up on Rosel's testimony during direct examination that he read defendant his *Miranda* rights using a Spanish-language department-issued card, to wit: "You also indicated earlier that you Mirandized him in Spanish?" Nor did defendant's own testimony at the hearing challenge the content of Rosel's admonition. In fact, defendant testified Rosel did not advise him of his rights in any form. Counsel did not argue, as defendant does on appeal, that Rosel's admonition implied discretion regarding the appointment of counsel.

Second, and concerning counsel's argument about defendant's statements to Trukki, it is plain counsel was challenging the voluntariness of those statements, specifically arguing Trukki's offer of assistance to defendant in the form of getting out of jail, whether express or implied, was coercive in nature. Counsel also made reference to the circumstances of defendant's confinement. Certainly the case law cited by counsel during his argument pertained to situations where the defendant alleged his admissions were the result of coercive tactics by law enforcement in the form of a promise of leniency or other coercion. Defense counsel's argument did not challenge Chavez's translation of the *Miranda* warnings in any way. In fact, at one point, defense counsel stated "improper translations" were not at issue. In any event, defense counsel's specific objections to the admissions given by defendant during the Trukki interview did not involve a challenge to Chavez's translation of the warnings from English to Spanish. Counsel did not argue Chavez's use of the verb "conseguir" was improper, nor did defense counsel argue the admonition was defective in light of Chavez's testimony that he forgot to say "'Sin pagar,' which is without payment."

Defendant also argues his motion to suppress this evidence served to preserve the issue for appeal. Defendant is mistaken. That motion fails to even identify the basis of defendant's challenge. It is nothing more than paragraph after paragraph of boilerplate law, followed by a generic conclusion that defendant's admissions "were made under duress and were coerced by intimidation and promises of assistance and leniency."

To the degree defendant argues the People's own motion[3] served to independently preserve the arguments he now asserts on appeal, we do not agree. First, the motion does not address any specific language employed by Rosel so as to preemptively raise the issue of improper discretion implied in the use of "can" rather than "will." Second, while the People's motion does reference Chavez's use of the verb "conseguir" and this court's

_____

[3]Although dated February 4, 2013, we note the motion is file-stamped February 5, 2013, the day after the hearing on this issue had concluded.

9.

holding in *People v. Diaz* (1983) 140 Cal.App.3d 813, the People's references thereto are in the context of addressing defendant's coercion argument. The motion specifically addresses defendant's employment as a field worker and certain cultural sensitivities, a factor the court may consider in ruling on the issue of voluntariness.

Significantly, we note the trial court did not address the arguments defendant now makes on appeal. Nothing in its ruling addresses an alleged impropriety in the form of any particular language employed by Rosel or Chavez during defendant's interview with Trukki. The trial court did not refer to the "can" versus "will" language employed by Rosel, nor did it refer to the omission of "sin pagar" or the use of "conseguir" as used by Chavez. Read in context of the testimony given at the hearing and the argument asserted, it is clear the trial court was not fairly informed as to the specific reason or reasons defendant now believes the evidence should have been excluded. Thus, the trial court did not have an opportunity to make a fully informed ruling. (*People v. Lucas* (2014) 60 Cal.4th 153, 264; see *People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1214.)

In sum, for the reasons explained above, defendant has failed to preserve this claim for appeal. (*People v. Lucas*, *supra*, 60 Cal.4th at p. 264-265; *People v. Partida*, *supra*, 37 Cal.4th at pp. 434–435.)

## B.     Ineffective Assistance of Counsel

Alternatively, defendant argues his trial counsel rendered ineffective assistance by failing to object.

An ineffective assistance of counsel claim requires a showing that "counsel's action was, objectively considered, both deficient under prevailing professional norms and prejudicial." (*People v. Seaton* (2001) 26 Cal.4th 598, 666, citing *Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*).)  "[T]he burden is on the defendant to show (1) trial counsel failed to act in the manner to be expected of reasonably competent attorneys acting as diligent advocates and (2) it is reasonably probable that a more favorable determination would have resulted in the absence of counsel's failings."

(*People v. Lewis* (1990) 50 Cal.3d 262, 288; see *People v. Weaver* (2001) 26 Cal.4th 876, 961.) This means the defendant "must show both that his counsel's performance was deficient when measured against the standard of a reasonably competent attorney and that counsel's deficient performance resulted in prejudice to [the] defendant in the sense that it 'so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.' [Citations.]" (*People v. Kipp* (1998) 18 Cal.4th 349, 366, quoting *Strickland*, *supra*, at p. 686.)

As to the first element, an appellate "court will indulge in a presumption that counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy. Defendant thus bears the burden of establishing constitutionally inadequate assistance of counsel. [Citations.] If the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged, an appellate claim of ineffective assistance of counsel must be rejected unless counsel was asked for an explanation and failed to provide one, or there simply could be no satisfactory explanation. [Citation.]" (*People v. Gray* (2005) 37 Cal.4th 168, 207; see *People v. Scott* (1997) 15 Cal.4th 1188, 1212.)

Were we to assume here that defense counsel's performance was deficient because of his failure to object, defendant cannot show he was prejudiced. To do so, he "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland*, *supra*, 466 U.S. at p. 694.) However, prejudice must be established as "'a "demonstrable reality," not simply speculation as to the effect of the errors or omissions of counsel.'" (*In re Clark* (1993) 5 Cal.4th 750, 766.)

Defendant contends this case, in the absence of his admissions, was based entirely upon the victim's questionable credibility. Therefore, defendant argues he suffered prejudice by admission of that evidence, entitling him to reversal. We are not swayed.

11.

It is plain the inconsistencies between Jane Doe's trial testimony and the statements she made during the forensic interview shortly after her father's arrest are the result of Jane's wish for her father to come home. Notably, too, Jane was very nervous.

At trial, Jane repeatedly denied any act of oral copulation—she said her father's "middle part" (penis)[4] was never in her mouth. She also testified she did not remember telling the police officer and the forensic interviewer otherwise. At one point, Jane said her mouth "almost" touched her father's middle part, followed immediately by her statement that she doesn't "really remember" and "tried to forget it." Later, Jane claimed her father "pulled" her down and her mouth almost touched his middle part. It happened more than once.

Jane did testify her father touched her breasts and her "middle part" (vagina) on more than one occasion. Jane never wavered from her numerous statements that she told both the police officer and the forensic interviewer the truth. She also testified her father told her not to tell anyone about the touching. Jane never wanted to touch her father and testified she was "grossed out" and "anxious" about what had happened. When she was asked the worst thing that happened when her father abused her, Jane replied, "probably everything that happened."

Officer Rosel testified Jane told him her father had been touching her for the past two years. He touched Jane's breasts and vagina. The officer said at one point Jane told him her father forced her head down toward his middle part and told her to lick it. Jane cried throughout the interview.

Forensic interviewer Josefina Roderick testified at trial. She conducted an interview with Jane Doe in February 2012. The interview was video recorded. Roderick testified the video recording is accurate. It was played for the jury.

---

[4]Asked to describe her father's "middle part," Jane said, "Cylinder."

12.

Defendant contends the interview "reveals a demeanor that does not provide much confidence in what [Jane] was saying." He notes she was "fidgety and distracted" and appeared to be suffering from a cough and cold. We have reviewed the videotape of Roderick's interview of Jane Doe. Defendant's complaints are not well taken. While the recording does depict an obviously nervous young girl who appears to be suffering the effects of a cold, we find nothing at all to support an inference of a lack of credibility. "A child witness is not a miniature version of an adult witness. Young children think, relate, and communicate in a qualitatively different manner than adults." (Couzens & Bigelow, Sex Crimes: Cal. Law and Procedure (The Rutter Group 2014) § 8.2.)

There was no evidence Jane had a motive to lie about being sexually abused by her father. She testified she loved her dad and she thought they had a good relationship. She missed him and wanted him to come home. In fact, that evidence tends instead to lend support to the inference Jane was motivated to minimize her father's abuse in her testimony at trial. Additionally, as Jane explained, she did not directly report the abuse. Rather, she told her closest friend Breanna. Breanna counseled Jane to tell someone. Jane did not, but Breanna did.

Lastly, we are not persuaded by defendant's assertion that *In re Edward S.* (2009) 173 Cal.App.4th 387 is similar to this case. The claim of ineffective assistance of counsel in *Edward S.* pertained to counsel's failure to investigate potentially exculpatory evidence and the resulting prejudice. Counsel was aware of certain issues bearing on the 10-year-old witness's credibility, including that she "had been exposed to more sexual conduct than most 10-year-olds [and] that on a specific occasion she threatened to lie in order to work her will," a claim that could purportedly be corroborated by more than one individual. (*Id*. at p. 408.) *Edward S*. is unlike this case because here there is no potentially exculpatory evidence at issue, nor are there similar concerns regarding Jane's credibility.

Even assuming error on the part of defense counsel, on this record we find any error to be harmless beyond a reasonable doubt.

## II. Unanimity Instruction

Defendant maintains the trial court erred in failing to instruct sua sponte on unanimity as to the oral copulation alleged in count 1. He further contends the error requires reversal. Plaintiff concedes the instruction should have been given, however, she claims the error was harmless.

We review a claim of instructional error de novo. (*People v. Manriquez* (2005) 37 Cal.4th 547, 581; *People v. Waidla*, *supra*, 22 Cal.4th at p. 733.) In a criminal case, a jury verdict must be unanimous. (*People v. Collins* (1976) 17 Cal.3d 687, 693.) The jury must agree unanimously that the defendant is guilty of a specific crime. (*People v. Diedrich* (1982) 31 Cal.3d 263, 281.) "[W]hen the evidence suggests more than one discrete crime, either the prosecution must elect among the crimes or the court must require the jury to agree on the same criminal act." (*People v. Russo* (2001) 25 Cal.4th 1124, 1132.) "The [unanimity] instruction is designed in part to prevent the jury from amalgamating evidence of multiple offenses, no one of which has been proved beyond a reasonable doubt, in order to conclude beyond a reasonable doubt that a defendant must have done *something* sufficient to convict on one count." (*People v. Deletto* (1983) 147 Cal.App.3d 458, 472.) Even if a unanimity instruction is not requested, the trial court has a duty to give the instruction whenever the evidence warrants it. (*People v. Carrera* (1989) 49 Cal.3d 291, 311, fn. 8.)

Count 1 alleged defendant had committed the crime of oral copulation pursuant to section 288.7, subdivision (b). Accordingly, the jury was instructed with CALCRIM No. 1128:

> "The defendant is charged in Count One with engaging in oral copulation with a child 10 years of age or younger.
>
> "To prove that the defendant is guilty of this crime, the People must prove that:

> "1. The defendant engaged in an act of oral copulation with Jane Doe;

> "2. When the defendant did so, Jane Doe was 10 years of age or younger;

> "3. At the time of the act, the defendant was at least 18 years old.

> "Under the law, a person becomes one year older as soon as the first minute of his or her birthday has begun.

> "*Oral copulation* is any contact, no matter how slight, between the mouth of one person and the sexual organ or anus of another person. Penetration is not required."  (Original italics.)

Moreover, the jury was also instructed regarding the credibility of witnesses, evaluating conflicting evidence, the testimony of a single witness to prove any fact, and conviction of a sexual assault crime can be based solely on the testimony of the complaining witness.

Even if we assume the trial court erred in failing to sua sponte instruct the jury with a unanimity instruction, any error is harmless beyond a reasonable doubt because the jury clearly believed Jane Doe's testimony.  And, the failure to give a unanimity instruction is harmless "if the record indicate[s] the jury resolved the basic credibility dispute against the defendant and would have convicted the defendant of *any* of the various offenses shown by the evidence to have been committed."  (*People v. Jones* (1990) 51 Cal.3d 294, 307.)

Despite some conflict between Jane Doe's testimony at trial and the statements she gave during the forensic interview, the record reveals the jury resolved the basic credibility dispute against defendant and would have convicted him of any of the various offenses shown by the evidence to have been committed.

During the forensic interview, Jane said that there "were—like—only two times" that she put her mouth on her father's penis.  On one occasion, Jane was taking a shower and her father was in the bathroom with her.  He "cleaned his middle thing" with water. Jane did not want to touch it, but he tried to "put [her] head down there so [she] could

15.

lick it." Her father told her to look down; Jane did so. Then her mouth was close to her father's penis and he was looking at her and signaling with his eyes for her to lick it. He pushed her head down with his hand. She did not want to lick it. On another occasion, Jane was lying on the floor sleeping and her father had laid down next to her. He directed Jane to slide down so she was facing his "middle thing." He put his hand on her head and told her to open her mouth. He pushed her head and she "licked" his penis. It went in her mouth and it felt "gross." Afterward, Jane got up and brushed her teeth. Her dad told her not to tell anyone. Although Jane's description of these two events—one in the bedroom and one in the bathroom—could be interpreted as describing one completed act of oral copulation because Jane did not explicitly describe her father's penis being inside her mouth in the bathroom incident, she did begin her description of the bedroom and bathroom incidents by saying her father's penis had been in her mouth "two times."

In his statement to detectives, defendant admitted he placed the tip of his penis in Jane's mouth on one occasion. He claimed Jane came into the bathroom while he was taking a shower. He opened the shower curtain and asked her to "do something" for him. She asked "what?" and he signaled what he wanted. He told her to put his penis in her mouth; she touched the tip of his penis with her mouth and then said she did not like it. Defendant admitted also that there were other times he tried to have Jane orally copulate him, but she pulled away on those other occasions. He told the detectives that he "respected when [Jane] said no." When the detective was summarizing his admissions, defendant again acknowledged his penis went in Jane's mouth on one occasion while they were in the bathroom, and when defendant wanted to put his penis in Jane's mouth on the other occasions, she did not want to so he did not force her to do so.

The jury watched Jane's forensic interview and also heard defendant's statement to the detectives. Both Jane and her father had reason to minimize their respective conduct; she because she loved him and wanted him out of jail and back at home, and he for obvious reasons.

Lastly, we are simply not persuaded by defendant's complaints regarding the interview technique and his interpretations of the interview here. We have reviewed the forensic interview and find no fault.

Following a review of this record, we are satisfied any instructional error was harmless. It is plain the jury resolved any credibility dispute against defendant and convicted him of oral copulation and all other charged sex offenses. (*People v. Jones*, *supra*, 51 Cal.3d at p. 307.) There is simply no reasonable possibility the verdict would have been different if the jury had been instructed on unanimity. Accordingly, we conclude any error by the trial court for failing to instruct the jury sua sponte with a unanimity instruction pursuant to CALCRIM No. 3500 was harmless beyond a reasonable doubt.

## III.     Sufficiency of the Evidence

Next, defendant contends there was insufficient evidence of force regarding the forcible lewd conduct alleged in count 4. Plaintiff maintains there is substantial evidence supporting the jury's finding.

In assessing a claim of insufficiency of the evidence, the reviewing court's task is to review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—evidence that is reasonable, credible, and of solid value upon which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence. It is the jury that must be convinced of a defendant's guilt beyond a reasonable doubt. If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment. (*People v. Watkins* (2012) 55 Cal.4th 999, 1019-1020; *People v. Rodriguez* (1999) 20 Cal.4th 1, 11; see *Jackson v. Virginia* (1979) 443 U.S. 307, 317–320; *People v. Johnson* (1980) 26 Cal.3d 557, 578.)

17.

In reviewing a challenge to the sufficiency of the evidence, appellate courts do not determine the facts. We examine the record as a whole in the light most favorable to the judgment and presume the existence of every fact the trier of fact could reasonably deduce from the evidence in support of the judgment. (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) If the verdict is supported by substantial evidence, a reviewing court must accord due deference to the trier of fact and not substitute its evaluation of a witness's credibility for that of the fact finder. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.) The testimony of a single witness—unless physically impossible or inherently improbable—is sufficient for a conviction. (Evid. Code, § 411; *People v. Young* (2005) 34 Cal.4th 1149, 1181.) Before the judgment of the trial court can be set aside for insufficiency of the evidence, "it must clearly appear that on no hypothesis whatever is there sufficient substantial evidence to support the verdict of the jury." (*People v. Hicks* (1982) 128 Cal.App.3d 423, 429; see *People v. Conners* (2008) 168 Cal.App.4th 443, 453.)

Under section 288, subdivision (a), it is a crime to commit a lewd or lascivious act on a child under age 14 with the intent to arouse or satisfy the sexual desires of the perpetrator or the child. Any touch with the requisite sexual intent is a violation of subdivision (a). (*People v. Martinez* (1995) 11 Cal.4th 434, 440–441, 452.) Subdivision (b)(1) of section 288 prohibits the commission of such an act "by use of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person." "[T]he force used for a subdivision (b) conviction [must] be 'substantially different from or substantially greater than that necessary to accomplish the lewd act itself.' [Citation.]" (*People v. Soto* (2011) 51 Cal.4th 229, 242.)

The "force" requirement of section 288, subdivision (b)(1) will be deemed satisfied when the defendant uses any force that is "different from and in excess of the type of force which is used in accomplishing similar lewd acts with a victim's consent." (*People v. Neel* (1993) 19 Cal.App.4th 1784, 1790.) "According to the majority of

18.

courts, this includes acts of grabbing, holding and restraining that occur in conjunction with the lewd acts themselves." (*People v. Alvarez* (2009) 178 Cal.App.4th 999, 1005 [force element met where defendant resisted victim's attempts to push him away, holding victim while digitally penetrating her before grabbing victim's hands and placing them on his penis]; *People v. Babcock* (1993) 14 Cal.App.4th 383, 388 [force element met when defendant grabbed victims' hands and made them touch his genital area].)

Here, during trial, Jane testified her father would sometimes enter the bathroom while she was showering and peek at her through the shower curtain. The following occurred thereafter:

"[PROSECUTOR] Q  After he opens the curtains, what's the next thing that happens?

"[JANE DOE] A  He reaches—he tries to grab me.

"Q  What does he reach with?

"A  His hand.

"Q  And what part of you does he try to grab?

"A  My hand.

"Q  What's the next thing that happens?

"A  Well, he pulls—he pulls me but not that hard.

"Q  When you say he pulls you, could you tell me what part of him he is using and what part of you he is touching?

"A  His hand and my hand.

"Q  What direction does he pull you?

"A  His direction.

"Q  And what's the next thing that happens?

"A  I don't really remember that time.

"Q  Have you ever seen your dad's middle part?

"A  Yes."

Asked about a time she saw her father's middle part, Jane recalled an occasion wherein she was taking a shower and defendant came into the bathroom before work, "unzipped his zipper and took [his middle part] out."  Asked whether she had ever touched his middle part, Jane answered affirmatively and said her hand moved because she pulled it away; she wasn't stopped from doing so.  Noting that touching had occurred while she was in the shower on more than one occasion, Jane testified she thought her dad wanted her to touch his middle part with her hand on more than one occasion.  She touched it with her hand once or twice.

On cross-examination, the following colloquy occurred:

"[DEFENSE COUNSEL] Q  … You mentioned yesterday that at one point in time I think you said—correct me if I am wrong—but I think you said that there was one time when your dad had grabbed your hand and asked you to—had pulled it towards you and wanted you to touch his middle part; is that right?

"[JANE DOE] A  Yes.

"Q  And when you say he grabbed your hand, you also said that you were able to pull your hand away?

"A  Yes.

"Q  Was he holding onto you?  Did he grab you and hold onto you real tight?

"A  No.

"Q  Okay.  Was there a lot of pressure on your hand or did he grab your hand or arm?

"A  My hand.

"Q  Your hand.  So if he grabbed your hand like this—

"A  Yes.

"[PROSECUTOR]:  For the record, counsel's right hand is over the top of his left fingers with the thumbs touching.

20.

"[DEFENSE COUNSEL]:  Thank you.

"THE COURT:  Yes.

"[DEFENSE COUNSEL]: Q  … So, Jane, he grabbed you by the hand with his hand.  Okay.  And did he squeeze it tight?

"A  No.

"Q  And you said that he kind of moved it towards himself, right?

"A  Yes.

"Q  Moved your hand towards his body?

"A  Yes.

"Q  And then you pulled your hand away?

"A  Yes.

"Q  Now, did you pull your hand away before or after you touched his middle part?

"A  Before.

"Q  All right.  Now the time—I think you said there's a time when you actually did touch his middle part, correct?

"A  Yes.

"Q  Was there one time or more than one time?

"A  One time.

"Q  And on that time when you touched his middle part, did he grab ahold of your hand at that time?

"A  Yes.

"Q  He did?  Okay.  And you didn't—were you able to pull your hand away that time?

"A  I don't really remember.

"Q  But you did actually touch it?

"A  Yes.

"Q  Did he still have ahold of your hand?  Had he grabbed your hand and was he still holding onto your hand when you touched his middle part?

"A  Yes.

"Q  And was he holding it tightly?

"A  I don't really remember."

During redirect examination, Jane indicated most of the incidents occurred in the shower, and although she was not afraid of her father, she was "grossed out" and anxious about what was happening.

In her forensic interview, Jane spoke about an incident occurring in the shower. Her mother told her to a take a shower because it had been three or four days.  While Jane was taking a shower, her dad came into the bathroom.  He looked or "peek[ed]" at her. He opened the shower curtain and used his eyes and hands to signal Jane to come closer. Jane leaned away from him; he tried to touch her breasts.  Her dad "grabbed" her when she turned.  More specifically, Jane said:

"[JANE DOE] A:  Um, like—he was, like—elbowing me a little bit closer.  He, like, kinda went—well, he grabbed me, like, not before.  But kinda grabbed me when, like, when he made—he, like, almost made me touch his middle thing.

"[INTERVIEWER] Q:  Okay.  How did he—uh—how'd he grab you?

"A:  Like, he—he grabbed me but not, like, hard.

"Q:  Okay.  Where did he grab you?

"A:  Like, on the hand.

"Q:  On what part of the hand?

"A:  It was right here.

"Q:  Is that just one hand or—or with both hands?

"A:  One hand.  [¶] … [¶]

22.

"Q: What did he use to grab your hand?

"A: His hand.

"Q: His hand? Okay. So he grabbed you by the hand and then what?

"A: Like, he tried to make me grab his middle thing.

"Q: He tried to grab you—make you grab his middle thing? How did he try to make you grab his middle thing?

"A: Because he pulled his pants down and, like, take it out. Then I almost touched it. [¶] … [¶]

"Q: How [did he try to get you to touch his middle thing]?

"A: Like, with my hand. He, like—he—he put his on my hand and then he, like, wanted to, like, touch it.

"Q: Okay. He made you touch it or he made you kinda touch it or what is it that …

"A: He made me, like, kinda touch it.

"Q: He—he made you kinda touch it? What do you mean—mean by kinda touch it.

"A: Like, I touched it but not that much.

"Q: You touched it but not that much?

"A: Like the very tip of it."

Jane clarified that her father made her touch his middle part by grabbing her hand and pulling her hand close to his middle part; her hand touched his middle part as a result. Later, the following exchange occurred:

"[INTERVIEWER] Q: … And so you said he was doing that when he—uh—while you were touching his middle part. Okay. How were you touching his middle part?

"[JANE DOE] A: Like, he made me touch it, though.

"Q: How did he make you touch it?

23.

"A: With his hand, he would put my hand on []his thing.

"Q: He put your hand on his thing? Okay. And so what did you do his—to his thing with your hand?

"A: I—I—like—I grabbed it but I didn't do nothing to it.

"Q: You grabbed it but you didn't do anything with it? Okay. When you grabbed his—um—his thing—his dick—what did he—um—did he still have his hand on yours? Yeah? Okay. And when he—when—um did you move your hand at all? No? Okay.…"

In sum, at trial Jane testified defendant grabbed her with his hand while she was in the shower, pulling her toward him. Asked what happened next, Jane said she could not remember. On cross-examination, Jane ultimately testified that on that occasion her father "grabbed [her] hand and was … still holding onto [her] hand when [she] touched his middle part." Similarly, in the forensic interview, Jane recounted an incident in the shower wherein her father "grabbed" her hand with his hand, putting her hand on the "very tip" of his penis. She later indicated he kept his hand on her hand.

This record contains evidence that is reasonable, credible and of solid value upon which the jury could find defendant used force on at least one occasion to commit a lewd and lascivious act against his daughter. (*People v. Watkins*, *supra*, 55 Cal.4th at pp. 1019-1020.)

We are not persuaded by defendant's reliance upon *People v. Senior* (1992) 3 Cal.App.4th 765, nor do we agree with defendant that the holdings of *People v. Neel*, *supra*, 19 Cal.App.4th 1784 and *People v. Bolander* (1994) 23 Cal.App.4th 155 dictate another outcome here. Briefly stated, we agree with the other appellate courts that have rejected *Senior*.

Examining the record as a whole, in the light most favorable to the judgment, we find there is sufficient evidence of force where defendant grabbed Jane Doe's hand with

his own and put her hand on his penis.[5]  (*People v. Alvarez*, *supra*, 178 Cal.App.4th at p. 1005; *People v. Kraft*, *supra*, 23 Cal.4th at p. 1053.)  This is simply not a case where a review of the record reveals "that on no hypothesis whatever is there sufficient substantial evidence" to support this jury's finding of guilt on count 4.  (*People v. Hicks*, *supra*, 128 Cal.App.3d at p. 429.)  Hence, there is no reason to set aside the judgment.

## IV.    Ex Post Facto Clause

Defendant argues the ex post facto clause was violated, as well as his right to have a jury determine every fact required for imposition of a mandatory minimum sentence, when the trial court applied the amended sentencing triad to count 4 in the absence of a jury finding that the conduct occurred before the effective date of the amendment. Plaintiff contends the trial court properly sentenced defendant to an eight-year term on count 4.

More specifically, defendant maintains the court erred because prior to September 9, 2010, a court could impose three, six, or eight years for a conviction of section 288, subdivision (b)(1).  Here, when the court imposed the eight-year sentence as the middle or median term, it was referring to the triad in place following the 2010 amendment, to wit:  five, eight, or ten years.  Defendant contends, because the jury did not make a finding that the crime alleged in count 4 took place on or after September 9, 2010, the eight-year sentence cannot be imposed because the jury could have convicted defendant for crimes committed prior to the 2010 amendment.  We hold to the contrary.

### A.    The Pertinent Law

"The United States Constitution and the California Constitution proscribe ex post facto laws.  (U.S. Const., art. I, § 10; Cal. Const., art. I, § 9.)  Both constitutions protect against the later adoption of a statute that inflicts greater punishment than the law in effect at the time of the commission of the crime.  (*Collins v. Youngblood* (1990) 497 U.S. 37, 42–

---

[5]Because we find sufficient evidence of force, we do not address defendant's argument concerning duress.

43; *People v. Grant* (1999) 20 Cal.4th 150, 158.)" (*People v. Riskin* (2006) 143 Cal.App.4th 234, 244.)

"[I]t is the prosecution's responsibility to prove to the jury that the charged offenses occurred on or after the effective date of the statute providing for the defendant's punishment. When the evidence at trial does not establish that fact, the defendant is entitled to be sentenced under the formerly applicable statutes even if he raised no objection in the trial court." (*People v. Hiscox* (2006) 136 Cal.App.4th 253, 256.)

An ex post facto violation resulting in an unauthorized sentence may be raised on appeal even if the defendant failed to object below and may be corrected at any time. (*People v. Dotson* (1997) 16 Cal.4th 547, 554, fn. 6.)

**B.      The Relevant Proceedings Below**

In the second amended information, count 4 was alleged as follows:

"For a further and separate cause of action, being a different offense of the same class of crimes and offenses as the charge set forth above, the said defendant(s) … did, on or about and between February 23, 2011 and February 13, 2012, in the County of Madera, State of California, commit a FELONY, namely, violation of Section 288(b)(1) of the Penal Code of the State of California, in that the said defendant did willfully, unlawfully, and lewdly commit a lewd and lascivious act upon and with the body and certain parts and members thereof of Jane Doe, a child under the age of fourteen years, with the intent of arousing, appealing to, and gratifying the lust, passions, and sexual desires of the said defendant and the said child, by use of force, violence, duress, menace, and threat of great bodily harm, when defendant grabbed Jane Doe's hand and forced her to touch his penis."

The dates alleged in the operative information correspond with Jane's 10th birthday  and the date of defendant's interview with detectives.

The jury's verdict found defendant guilty of Penal Code section 288, subdivision (b)(1) "as charged in Count Four of the Information on file herein."

At the sentencing hearing, after defendant and Jane's mother addressed the court and after counsel argued their respective positions regarding an appropriate sentence, the court sentenced defendant as follows:

26.

"[THE COURT:] So [defendant], in this matter you are sadly mistaken. I listened to the evidence in this trial and I listened to your daughter and it—she didn't want to be up here. It was clear that she did not want to have to testify against her father. And I believed that much more happened than she testified to given your statement to the police and given the statement that she gave at the time to—pursuant to the interview that she had given. In addition, I find your testimony about what the officers did absolutely ludicrous. I have no sympathy for you. I have tremendous sympathy for [Jane Doe's mother] and her daughters. You have destroyed their lives. You had a great life with them. And you just destroyed it. So in this matter probation is denied pursuant to Penal Code Section 1203.065, Subdivision (a) ….

"As to Count 2, a felony violation of Section 288, Subdivision (a), Court imposes the median term of 6 years, deems that the principal term. As to Count 3, a felony violation of Section 288, Subdivision (a) of the Penal Code, Court imposes two years State Prison, which is … one third of the median term of 6 years. That's imposed consecutive pursuant to Section 1170.1 Subdivision (a) and deemed a subordinate term.

"As to Count 4, a felony violation of Section 288, Subdivision (b)(1) of the Penal Code, Court imposes 8 years State Prison, median term. And that's imposed full separate and consecutive pursuant to Penal Code Section 667.6, Subdivision (d). Aggregate term of the determinate term is 16 years in State Prison. Pursuant to Penal Code Section 669, the determinate term is to be served prior to the indeterminate term imposed in Count 1 and the determinate term is consecutive to each other and consecutive to the indeterminate term which will be imposed in Count 1. As to Count 1, a felony violation of Section 288.7, Subdivision (b) of the Penal Code, Court imposes 15 years to life—to life in State Prison, consecutive. The aggregate term of the indeterminate term is 15 years to life in prison."

## C.    Our Analysis

We find no ex post facto violation here. The operative information specifically alleged defendant had committed a violation of section 288, subdivision (b)(1) between February 23, 2011 and February 13, 2012. The relevant amendment to section 288 occurred September 9, 2010. More than five months passed between the date the statutory amendment took effect and the earliest date alleged in the information. Defendant argues the five-month period is "reasonably close" to the date of amendment

and thus the jury should have made a finding that the violation took place on or after September 9, 2010. We do not agree.

Although the record does include Officer Rosel's testimony that Jane told him defendant began molesting her when she was seven or eight years old—possibly implicating the September 2010 amendment—the record also properly includes defendant's statement to detectives. In that statement, defendant denies touching Jane when she was seven or eight years old. The first time he touched Jane was eight or ten months prior to the interview. On that occasion, he touched her breasts over her clothing because he said she had complained of pain. Six or seven months prior to the interview he touched her breasts and her vagina; Jane was not clothed. Defendant agreed with the detective's assessment that he started out with good intentions (8-10 months prior to interview) then became aroused by the contact with Jane and it led to more. The first time defendant touched Jane's vagina was six months prior to the interview and he had done so three times since. Further, defendant indicated his penis touched Jane's vagina "only" two or three times. On one occasion, defendant indicated his penis was in his daughter's mouth. Defendant explicitly indicated he began touching Jane "a little after [she turned] 10 years old" and that he had been touching her for less than a year at the time of his interview. Finally, defendant was asked when he last touched his daughter and he indicated it had been about a week prior to his arrest or "last Wednesday."[6]

We recognize that Jane testified she did not remember how old she was when her father began touching her.[7] On cross-examination, Jane was asked whether she remembered "when these things happened," and she replied, "No, I tried to forget it this

---

[6]We note during the forensic interview of February 14, 2012 (the day after defendant's interview with detectives) Jane indicated she had been touched by her father "last week," meaning a week prior to his going to jail.

[7]At page 25 of plaintiff's brief, the People assert the following: "Jane Doe stated that her father had sexually abused her since she was 10 years old. (2 RT 336.)" However, a careful review of the referenced testimony reveals only that Jane told Rosel she had been the victim of sexual abuse and, separately, that she was then 10 years old.

28.

whole year." Jane's testimony was vague as to any date and/or her age at the time the offenses were being committed. She testified frequently that the various touchings happened more than one time. Jane told her friend Breanna first and believed it was about a month later that police came to speak with her.

We agree with the People that defendant's reliance upon our decision in *People v. Riskin*, *supra*, 143 Cal.App.4th 234 is misplaced. In *Riskin*, the amendment at issue occurred during the relevant charging period. In other words, Riskin was alleged to have committed certain crimes between June 1994 and June 1998; the one strike law was enacted in November 1994. However, as noted above, the charging period specifically alleged here is February 23, 2011, through February 13, 2012. (E.g., *People v. Hiscox*, *supra*, 136 Cal.App.4th at pp. 257-258 [11 counts alleged over "'years of 1992 through 1996'" where the one strike law took effect Nov. 30, 1994].)

In conclusion, this is not a case where the information alleged various acts were committed during a particular time period and within that identifiable time period the relevant statute was amended, thereby increasing the potential punishment. Rather, here, the information alleged the acts had occurred between the time Jane turned 10 years of age until the date of defendant's interview with detectives. Jane's trial testimony and forensic interview do not shed light on the relevant dates associated with the molestations she disclosed. Nevertheless, in defendant's statement to detectives—wherein he acknowledges very similar conduct to that which Jane testified—he expressly denied touching Jane before she turned 10 years old. As a result, unlike the authorities upon which defendant relies, there was no ex post facto violation here. Lastly, because we find no ex post fact violation, we do not address defendant's related Sixth Amendment argument.

## V. Reasonable Doubt Illustration

Defendant contends it was error for the trial court to refuse defense counsel's request to use a chart illustrating the concept of reasonable doubt during closing

argument. The People contend the trial court properly denied the request to use a visual aid illustrating the burden.

After the defense rested and before the jury was instructed prior to deliberations, the record contains the following:

> "[DEFENSE COUNSEL]: We had some off the record discussions regarding a demonstrative evidence not—strike that. Demonstrative tool for argument which the Court and the people objected to. The Court has ruled inadmissible, and I just want to place that on the record.

> "THE COURT: I hadn't ruled inadmissible but I will—it seems to try and define beyond a reasonable doubt inappropriately, so I am not going to allow it."

The demonstrative tool in question was made a part of the record on appeal by way of augmentation ordered August 20, 2013. Referred to as "Exhibit B," the proffered

**BURDEN OF PROOF**

GUILTY ← GUILTY BEYOND A REASONABLE DOUBT
GUILT HIGHLY LIKELY
GUILT LIKELY
PROBABLY GUILTY
POSSIBLY GUILTY
SUSPECTED
NOT GUILTY — PERHAPS
MAY NOT BE
POSSIBLY NOT
PROBABLY NOT
UNLIKELY
HIGHLY UNLIKELY
PROVEN NOT GUILTY

graph is depicted as follows:

The trial court has the authority and duty to control proceedings during trial and may limit the introduction of evidence and argument of counsel. (Pen. Code, § 1044; *People v. Carpenter* (1997) 15 Cal.4th 312, 397.) Absent a patent abuse of discretion, the

30.

trial court's decision under section 1044 will be upheld on appeal. (*People v. Cline* (1998) 60 Cal.App.4th 1327, 1334.) We see no abuse of discretion.

"Advocates are given significant leeway in discussing the legal and factual merits of a case during argument. [Citation.] However, 'it is improper for the prosecutor to misstate the law generally [citation], and particularly to attempt to absolve the prosecution from its … obligation to overcome reasonable doubt on all elements [citation].' [Citations.]" (*People v. Centeno* (2014) 60 Cal.4th 659, 666.) Similarly, we believe it would have been improper for the trial court to permit defense counsel to use the chart illustrated above because it misstates the law generally.

Nontraditional explanations of the phrase "beyond a reasonable doubt" have generally been discouraged. (*People v. Medina* (1995) 11 Cal.4th 694, 745.)

> "The case law is replete with innovative but ill-fated attempts to explain the reasonable doubt standard. (See *People v. Johnson* (2004) 119 Cal.App.4th 976, 985–986; *People v. Garcia* (1975) 54 Cal.App.3d 61, 63.) We have recognized the 'difficulty and peril inherent in such a task,' and have discouraged such '"experiments"' by courts and prosecutors. (*Medina*, *supra*, 11 Cal.4th at p. 745.)" (*People v. Centeno*, *supra*, 60 Cal.4th at p. 667.)

The jury was instructed[8] as to the accepted reasonable doubt standard:

> "The fact that a criminal charge has been filed against the defendant is not evidence that the charge is true. You must not be biased against the defendant just because he has been arrested, charged with a crime, or brought to trial.

> "A defendant in a criminal case is presumed to be innocent. This presumption requires that the People prove a defendant guilty beyond a reasonable doubt. Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt unless I specifically tell you otherwise.

---

[8]The court also instructed the jury: "You must follow the law as I explain it to you, even if you disagree with it. If you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions."

31.

"Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt.

"In deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all the evidence that was received throughout the entire trial. Unless the evidence proves the defendant guilty beyond a reasonable doubt, he is entitled to an acquittal and you must find him not guilty."

Defense counsel's request was viewed as inappropriate by the trial court. It considered the chart or visual aid as one that would experiment or tinker with the accepted definition of reasonable doubt found in CALCRIM No. 220. It could also have served to mislead or confuse the jury.

We acknowledge that "not all visual aids are suspect [and that the] use of charts, diagrams, lists, and comparisons *based on the evidence* may be effectively and fairly used in argument to help the jury analyze the case." (*People v. Centeno*, *supra*, 60 Cal.4th at p. 671.) Here, however, the chart illustrated above is not one based on evidence that would have effectively or fairly assisted the jury in analyzing the case.

In a supplemental brief dated April 30, 2014, defendant asks that we consider a then very recent holding of the Ninth Circuit Court of Appeals entitled *Frost v. van Boening* (9th Cir. 2014) 757 F.3d 910, wherein the federal circuit court ruled it was reversible, structural error to prohibit defense counsel from using a visual aid in summation regarding the burden of proof. Nevertheless, in late 2014, the United States Supreme Court reversed the Ninth Circuit's decision in *Glebe v. Frost* (2014) ___ U.S. ___ [135 S.Ct. 429]. The high court held that even assuming its prior decision in *Herring v. New York* (1975) 422 U.S. 853 "established that complete denial of summation amounts to structural error, it did not clearly establish that the restriction of summation also amounts to structural error." (*Glebe v. Frost*, *supra*, 135 S.Ct. at p. 431, italics omitted.) It also held that the Ninth Circuit erred because it went "much too far to

32.

suggest that our cases clearly establish that this supposed extraction of a 'taci[t] admi[ssion]' is structural error." (*Id*. at pp. 431-432.)

Defendant's supplemental brief also argued that apart from the question of whether the error was structural, *Frost v. van Boening* "illustrates the significance of the type of error in this case, which goes to the heart of reasonable doubt." Initially, we note the obvious—that in light of *Glebe v. Frost*, *Frost v. van Boening* is no longer viable legal authority. Additionally, we note "[d]ecisions of the lower federal courts interpreting federal law, though persuasive, are not binding on state courts." (*Raven v. Deukmejian* (1990) 52 Cal.3d 336, 352.) In any event, we find *Frost v. van Boening* distinguishable. Defense counsel was not denied the ability to argue whether the People had met their required burden of proving the crimes alleged beyond a reasonable doubt. Rather, defendant was merely restricted from using a visual aid to make his arguments to the jury.

In the main, we assign no error to the trial court's ruling that defense counsel was prohibited from using a visual aid concerning the concept of reasonable doubt.

## VI. Motion to Quash the Venire

Defendant claims the trial court committed error by denying his motion to quash the venire when an individual "gave a highly emotional and inflammatory account of her own family's victimization."

### A. The Relevant Law

A criminal defendant has the constitutional right to a determination of guilt or innocence by a fair and impartial jury. (U.S. Const., 6th & 14th Amends.; Cal. Const., art. I, § 16; *People v. Wheeler* (1978) 22 Cal.3d 258, 265, overruled in part by *Johnson v. California* (2005) 545 U.S. 162, 165-173; *People v. Martinez* (1991) 228 Cal.App.3d 1456, 1459–1460.) The California Supreme Court discussed the standards for dismissing a jury panel in *People v. Medina* (1990) 51 Cal.3d 870. As the court explained, "discharging the entire venire is a remedy that should be reserved for the most serious

occasions of demonstrated bias or prejudice, where interrogation and removal of the offending venirepersons would be insufficient protection for the defendant." (*Id*. at p. 889.) That "drastic remedy" is not "appropriate as a matter of course merely because a few prospective jurors have made inflammatory remarks." (*Ibid*.)

The refusal to dismiss a jury panel is reviewed for an abuse of discretion. (*People v. Medina*, *supra*, 51 Cal.3d at p. 889; *People v. Nguyen* (1994) 23 Cal.App.4th 32, 41-42.) As explained in *Medina*, "the trial court possesses broad discretion to determine whether or not possible bias or prejudice against the defendant has contaminated the entire venire to such an extreme that its discharge is required." (*People v. Medina*, at p. 889.) For that reason, the trial court's determination "on the question of individual juror bias and prejudice is entitled to great deference and is reversed on appeal only upon a clear showing of abuse of discretion." (*People v. Martinez*, *supra*, 228 Cal.App.3d at p. 1466.)

## B. The Pertinent Voir Dire Proceedings

During jury selection, the following colloquy occurred between a prospective juror, the court and counsel:

> "THE COURT: Were you able to hear the questions?
>
> "JUROR NO. 10: Yes.
>
> "THE COURT: Any of those questions call for a specific response by you? [¶] … [¶]
>
> "JUROR NO. [10]: Yes. I personally am a victim of sexual abuse. As a result of—my oldest daughter belongs to my brother and I have three children that both my daughters have both been molested so—
>
> "THE COURT: Anything about that that's going to cause you to have a doubt as to your ability to be fair and impartial?
>
> "JUROR NO. 10: No. I mean, I know the things that have happened to me—with much prayer and help from the Lord that I have been able to overcome them. And I mean as even with the truth coming out, my brother has taken his life over it, but looking at the situation, looking at the facts, has no bearing on me because I am able to set my feelings aside.

"THE COURT: Okay. Have you ever served as a juror before?

"JUROR NO. 10: No, sir.

"THE COURT: Do you recognize any of the names of potential witnesses?

"JUROR NO. 10: I do recognize the name [*sic*] of the three police officers.

"THE COURT: How do you recognize them?

"JUROR NO. 10: I work for the probation department. I talked to them a lot on the phone. I've never personally met them face to face, but I have talked to them on the phone.

"THE COURT: Anything about that that would cause you to have a doubt as to your ability to be fair and impartial?

"JUROR NO. 10: No. [¶] … [¶]

"THE COURT: I think we have—other than what you have told me, are you—do you know anyone else that's close to you that's been the victim of child sexual assault or child molestation?

"JUROR NO. 10: Just my two daughters.

"THE COURT: Anything about—I didn't get into that. Were those reported to law enforcement?

"JUROR NO. 10: One of them was.

"THE COURT: And did anything—any charges brought as a result of that?

"JUROR NO. 10: Yes. My youngest daughter, it was my son-in-law that had molested her. He went to prison over it.

"THE COURT: And how do you feel about the way the system handled that?

"JUROR NO. 10: I think it was very fair.

"THE COURT: Other than your son-in-law and your brother, anyone close to you been suspected, accused, investigated, arrested, charged or prosecuted for sexual assault or child molestation?

35.

"JUROR NO. 10:  No.

"THE COURT:  Have you ever witnessed an incident that you believe to be child molestation?

"JUROR NO. 10:  No, sir.

"THE COURT:  Have you ever had occasion to report child abuse or child molest?

"JUROR NO. 10:  No.  [¶] … [¶]

"THE COURT:  All right.  Any reason as you sit here why you think—any reason that you would have a doubt as to your ability to be fair and impartial?

"JUROR NO. 10:  I have no doubt.

"THE COURT:  [Defense counsel]?

"[DEFENSE COUNSEL]:  What exactly do you do for probation department?

"JUROR NO. 10:  I am a program assistant.  I work with the AB109 unit.

"[DEFENSE COUNSEL]:  And again, I appreciate your candor regarding your life experiences regarding these types of matters.  Does it trouble you at all to sit on a case such as this?

"JUROR NO. 10:  Not at all, no.  I mean, I had a lot of years to learn how to forgive and learn how to move on.  And like I say, my brother ended up taking his life over it and because—for years I thought I was his only victim and it wasn't until his death that I found out that he molested a lot of other girls, too.  And the police were closing in on him so that's the reason he took his life because my daughter decided—she was about 12 years old and she wanted to get to know who her biological dad was.  She wrote him a letter and it was too much—she wrote him a letter and he, from the story that came back to me, it was too much for him to handle and he went out in the garage and took his life.

"[DEFENSE COUNSEL]:  You have indicated—obviously with your position that you work closely with law enforcement as a probation officer.  Are you a sworn peace officer?

"JUROR NO. 10:  No, I am clerical.  [¶] … [¶]

36.

"[PROSECUTOR]: Now you mentioned a couple of things. First of all, you mentioned that your daughter was the victim?

"JUROR NO. 10: Yes.

"[PROSECUTOR]: That was of your son-in-law, so was that her brother-in-law?

"JUROR NO. 10: My oldest daughter was the victim of her uncle on her dad's side of the family when she was about 5. She is 34 now. My youngest one is the victim of my son-in-law. Oldest daughter, first husband.

"[PROSECUTOR]: Did that ever happen in your home? Were you aware of that was going on?

"JUROR NO. 10: My oldest one, it was in my home. I did not know it at the time. I was—just come home from having my baby from the hospital, having a baby. I didn't find out until later because my daughter blocked it out. My brother-in-law who was living with us at the time had followed her and we did not know it until 10 years later we were in church. There's this gentleman that came in, there was something about him that triggered and she broke down crying, that's when she broke down.

"[PROSECUTOR]: Did that end up reporting it to the police?

"JUROR NO. 10: My brother-in-law lives all the way in Washington.

"[PROSECUTOR]: Your oldest daughter, she is 34 and I don't know if I heard this right, you said that she wrote a letter to her biological father?

"JUROR NO. 10: Which is the one that had molested me.

"[PROSECUTOR]: Is that your brother or half brother?

"JUROR NO. 10: That's my half brother.

"[PROSECUTOR]: That's what caused him to—

"JUROR NO. 10: He took a gun out from the seat of his truck.

"[PROSECUTOR]: You're okay to listen?

"JUROR NO. 10: I am okay. As a matter of fact, I had healed to the point emotionally that if he was standing here today I could hug him because he is my brother and I love him still.

37.

"[PROSECUTOR]: All right.  [¶] … [¶]

"THE COURT:  Pass for cause?

"[DEFENSE COUNSEL]:  No.

"THE COURT:  Challenge and it is defense challenge.

"[DEFENSE COUNSEL]:  At this point in time I would ask the Court to thank and excuse [Juror No. 10]."

The following morning, defense counsel addressed the court:

"[DEFENSE COUNSEL]:  Yes, Your Honor.  Thank you.  At this point in time, I would like to make a motion to disqualify the panel that's presently been—the first panel that was seated that was present.  When the [prospective] juror … was giving her statements regarding her experience both as an officer of the court or as a probation officer—more importantly as a victim and the mother of two victims of sexual abuse.  I think that her—I contend that her statements have compromised the jury pool to the extent that they became somewhat indoctrinated about the emotional— well, her story, if you will.  And I would ask the Court—I move at this time that that panel be disqualified.

"THE COURT:  Very well.  At first [Juror No. 10] is not a probation officer, she is a clerk.

"[DEFENSE COUNSEL]:  She works for probation, I apologize.

"THE COURT:  The court finds that [Juror No. 10] was truthful and wasn't overly emotional.  And she gave her story.  And, frankly, I am going to ask the jurors prior to swearing them if there's anything that has occurred or come to them that causes them to have a doubt as to their ability to be fair and impartial before I swear them in.  And I think that for those reasons, the motion is denied."

Prior to swearing in the chosen panel and two alternate jurors, the court inquired of them as follows:

"All right.  Ladies and gentlemen, as you—I am just going to ask all of you, has anything occurred during the last couple of days or during jury selection that gives any of you a—causes any one of you to have a doubt as to your ability to be fair and impartial in this matter?  All right.  Would you please stand and be sworn at this time."

38.

## C. Our Analysis

Dismissal of the venire—a "drastic remedy"—was not required here in light of a single juror's remarks. Defense counsel's remedy of excusing the prospective juror provided sufficient protection for defendant. (*People v. Medina*, *supra*, 51 Cal.3d at p. 889.)

In *Medina*, five prospective jurors made biased and inflammatory remarks against the defendant. These remarks included statements such as even the defendant's "'lawyers think he's guilty,'" and "'bring the guilty S.O.B. in, we'll give him a trial, and then hang him.'" (*People v. Medina*, *supra*, 51 Cal.3d at p. 888.) The jurors who made the comments were excused and the remaining prospective jurors affirmed their abilities to be fair and impartial. (*Id.* at pp. 888-889.) Our high court affirmed the trial court's denial of the defendant's motion to excuse the panel, stating that such a drastic remedy "should be reserved for the most serious occasions demonstrat[ing] bias or prejudice." (*Medina*, *supra*, at p. 889.) Although the content of the prospective juror's answers held the potential for bias or prejudice, unlike *Medina*, none was demonstrated here. Hence, no drastic remedy was called for.

Defendant argues the prospective juror "provided a hair-raising account" of sexual abuse, referring to her account as "emotional." He claims she "evidently broke down as she revealed the horror," yet a review of the record does not support his interpretation. We read this passage of the record to be the prosecutor inquiring into whether the juror would be comfortable listening to the details likely to be heard in a child molestation case. We utterly disagree with defendant's depiction of the juror breaking "down as she recounted the horror" of her own experiences. Moreover, the trial court explicitly indicated the prospective juror was *not* "overly emotional" when she truthfully responded to the questions asked. We defer to the trial court, which "is in a better position to gauge the level of bias and prejudice created by juror comments." (*People v. Martinez*, *supra*, 228 Cal.App.3d at p. 1466.)

Further, we are not persuaded by defendant's attempts to distinguish those authorities wherein the trial court's denial of a defendant's motion to quash the venire was upheld. Additionally, we find defendant's reliance on *Mach v. Stewart* (9th Cir. 1998) 137 F.3d 630 to be unpersuasive. In *Mach*, a prospective juror in a child sexual abuse prosecution was a social worker with the State of Arizona Child Protective Services. The juror indicated before the entire jury panel that she would have a difficult time being impartial in that "sexual assault had been confirmed in every case in which one of her clients reported such an assault." (*Id*. at p. 632.) Further questioning established the juror "had never, in three years in her position, become aware of a case in which a child had lied about being sexually assaulted." (*Ibid*.) The Ninth Circuit Court of Appeals "presume[d]" the juror's comments "tainted" at least one juror, violating the defendant's right to an impartial jury. (*Id*. at p. 633.)

We again note that "[d]ecisions of the lower federal courts interpreting federal law, though persuasive, are not binding on state courts." (*Raven v. Deukmejian*, *supra*, 52 Cal.3d at p. 352.) In addition, California law does not indulge in a presumption of jury taint or prejudice arising from a prospective juror's remarks as the Ninth Circuit did in *Mach*. (*People v. Medina*, *supra*, 51 Cal.3d at p. 889 [trial court possesses broad discretion to determine whether possible bias or prejudice against defendant has contaminated entire venire to such an extreme its discharge is required. Such a drastic remedy is not appropriate as a matter of course merely because a few prospective jurors have made inflammatory remarks].) We are bound to follow the principles enunciated by our state's highest court. (*Auto Equity Sales*, *Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

Moreover, *Mach* is factually distinguishable. Here, while the prospective juror worked for the probation department, her references to that employment do not compare to the unequivocal assertion that children do not lie about being sexually assaulted as was the case in *Mach*. The prospective juror indicated she recognized the names of three law

40.

enforcement officers involved in the case because of her employment as a program assistant in that department. Unlike the social worker in *Mach* who dealt directly with child victims and a caseload, and who claimed an inability to be impartial as a result of that work, the prospective juror here is a clerical employee who did not refer to any work-related experience affecting her impartiality. In fact, although she was familiar with the names of the three officers she has had occasion to speak with on the telephone, she had never met any of them, and she expressly indicated a number of times that she could be fair and impartial.

In sum, the prospective juror's comments concerning past sexual assaults committed against her and her daughters did not call for the "drastic remedy" of dismissing the entire venire. We find no abuse of discretion in the trial court's denial of defendant's motion to quash the jury panel.

## VII. Cumulative Error

Next, defendant asserts cumulative error requiring reversal. However, because we have found only one (harmless) error in defendant's first six arguments on appeal, his claim of cumulative error fails. (See *People v. Seaton, supra,* 26 Cal.4th at p. 639; *People v. Bolin* (1998) 18 Cal.4th 297, 335.)

## VIII. Presentence Report Fee

Lastly, defendant contends the trial court erred in imposing a presentence report fee. Plaintiff concedes error. We agree with defendant and accept plaintiff's concession.

As both parties recognize, the trial court declined to impose a $750 presentence report fee, finding defendant lacked the ability to pay. Nevertheless, both the minutes corresponding to the sentencing hearing and the abstract of judgment reflect imposition of the fine. Since the abstract of judgment does not accurately reflect the judgment as orally pronounced, we will direct the trial court to prepare a corrected abstract of judgment. (*People v. Mitchell* (2001) 26 Cal.4th 181, 185; *People v. Meza* (1975) 14 Cal.3d 466, 471.)

41.

## DISPOSITION

The trial court is directed to issue a corrected abstract of judgment, omitting any reference to imposition of a $750 presentence report fee.  The judgment is affirmed in all other respects.

_____
                                                   PEÑA, J.

WE CONCUR


_____
DETJEN, Acting P.J.


_____
SMITH, J.